**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

|  |  |  |
|---|---|---|
| **U.S. COMMODITY FUTURES TRADING COMMISSION,** | ) ) ) | **CIVIL ACTION NO. 0:15-cv-62049** |
| **Plaintiff,** | ) ) | **Judge _____** |
| **v.** | ) ) | |
| **TODD OWEN MARSHALL, HARVARD ASSETS LLC, LONDON ASSETS INC., AND HARVARD INTERNATIONAL TRADING, INC.,** | ) ) ) ) ) | |
| **Defendants.** | ) ) | |

**COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT**

Plaintiff, U.S. Commodity Futures Trading Commission ("Commission" or "CFTC"), by its attorneys, alleges as follows:

## I.   SUMMARY

1.      Defendants Harvard Assets LLC ("Harvard Assets"), London Assets Inc. ("London Assets"), and Harvard International Trading, Inc. ("Harvard International"), by and through their officers, employees, and/or agents, including Defendant Todd Owen Marshall ("Marshall") (collectively, "Defendants"), offered to enter into, entered into, executed, confirmed the execution of, and/or conducted an office or business in the United States, for the purpose of soliciting, or accepting orders for, or otherwise dealing in, transactions in, or in connection with, precious metals on a leveraged, margined, or financed basis. These transactions, as further described herein, were illegal off-exchange retail commodity transactions.

2.      Moreover, Harvard Assets, London Assets, and Harvard International, in or in connection with these illegal off-exchange retail commodity transactions, accepted money, securities, or property (or extended credit in lieu thereof) to margin, guarantee, or secure trades or contracts that resulted or may have resulted therefrom, without registering with the Commission as a futures commission merchant ("FCM").

3.      By this conduct and the conduct further described herein, from on or around July 16, 2011 to April 30, 2012 or later (the "First Relevant Period"), Harvard International and Marshall have engaged in conduct in violation of Section 4(a) of the Commodity Exchange Act, as amended (the "Act"), 7 U.S.C. § 6(a) (2012), and Harvard International has engaged in conduct in violation of Section 4d(a)(1), 7 U.S.C. § 6d(a)(1) (2012), and are each directly liable for this conduct.

4.      By this conduct and the conduct further described herein, from on or around September 6, 2012 or earlier to March 5, 2013 or later (the "Second Relevant Period"), Harvard Assets, London Assets, and Marshall have engaged in conduct in violation of Section 4(a) of the Act, 7 U.S.C. § 6(a) (2012), and Harvard Assets and London Assets have engaged in conduct in violation of Section 4d(a)(1), 7 U.S.C. § 6d(a)(1) (2012), and are each directly liable for this conduct.

5.      The officers, employees, and/or agents of Harvard Assets, London Assets, and Harvard International, including Marshall, committed the acts and omissions alleged herein within the course and scope of their employment, agency, or office with Harvard Assets, London Assets and Harvard International.  Therefore, Harvard Assets, London Assets, and Harvard International are liable, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Commission Regulation 1.2, 17 C.F.R. § 1.2 (2014), as

principals for the violative acts and omissions of the employees and/or agents of Harvard Assets, London Assets, and Harvard International, including Marshall.

6.      During the First Relevant Period, Marshall controlled Harvard International, and did not act in good faith or knowingly induced Harvard International's violations of the Act.  Therefore, Marshall is liable for Harvard International's violations of Sections 4(a) and 4d(a)(1) of the Act, as a controlling person pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012).

7.      During the Second Relevant Period, Marshall controlled Harvard Assets and London Assets, and did not act in good faith or knowingly induced Harvard Assets' and London Assets' violations of the Act.  Therefore, Marshall is liable for Harvard Assets' and London Assets' violations of Sections 4(a) and 4d(a)(1) of the Act, as a controlling person pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012).

8.      Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), the CFTC brings this action to enjoin Defendants' unlawful acts and practices, to compel their compliance with the Act, and to further enjoin them from engaging in any commodity-related activity, as set forth below.

9.      In addition, the CFTC seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, restitution, disgorgement, rescission, post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

10.     Unless restrained and enjoined by this Court, Defendants likely will continue to engage in the acts and practices alleged in this Complaint or similar acts and practices, as more fully described below.

## II.    JURISDICTION AND VENUE

11.    Section 6c(a) of the Act, 7 U.S.C. §13a-1(a) (2012), authorizes the Commission to seek injunctive relief against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of the Act or any rule, regulation, or order thereunder.

12.    The Commission has jurisdiction over the conduct and transactions at issue in this case pursuant to Section 2(c)(2)(D) of the Act, 7 U.S.C. § 2(c)(2)(D) (2012).

13.    Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2012), because Defendants reside in this District, Defendants transacted business in this District, and certain transactions, acts, and practices alleged in this Complaint occurred, are occurring, and/or are about to occur within this District.

## III.    THE PARTIES

14.    Plaintiff CFTC is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act, as amended, 7 U.S.C. §§ 1 *et seq.*, and the Regulations promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq.*

15.    Defendant Harvard International was a Delaware corporation, incorporated on or about February 21, 2008, with a place of business in Boca Raton, Florida.  During the First Relevant Period, Harvard International claimed to be a market maker and dealer to retail customers in precious metals, including gold, silver, platinum, and palladium bullion, as well as gold, silver, platinum, and palladium coins.  Using telemarketers and a website it owned, www.harvardassets.com, Harvard International solicited retail customers to invest in leveraged, margined, or financed precious metals transactions.  From on or about April 29, 2008 to on or about April 30, 2010, Harvard

4

International was registered with the Commission as an introducing broker, notice broker dealer, and NFA member.  Harvard International's status as a Delaware corporation was revoked on or about March 1, 2014.  Harvard International is not currently registered with the Commission in any capacity.

16.     Defendant Harvard Assets was a Delaware limited liability company, formed on or about April 18, 2012, with a place of business in Boca Raton, Florida, and with the same address as Harvard International but a different suite number.  During the Second Relevant Period, Harvard Assets claimed to be a market maker and dealer to retail customers in precious metals, including gold, silver, platinum, and palladium bullion, as well as gold, silver, platinum, and palladium coins.  Using telemarketers and the website www.harvardassets.com, Harvard Assets solicited retail customers to invest in leveraged, margined, or financed precious metals transactions.  Harvard Assets' status as a Delaware limited liability company was revoked on or about September 6, 2014. Harvard Assets has never been registered with the Commission in any capacity.

17.     Defendant London Assets, an affiliate of Harvard Assets, was a Delaware corporation, incorporated on or about August 27, 2012, with a place of business in Boca Raton, Florida, and with the same address as Harvard International.  During the Second Relevant Period, Harvard Assets and London Assets had at least one common officer, employee, and/or agent.  For leveraged, margined, or financed precious metals transactions on behalf of Harvard Assets' customers that were introduced to Hunter Wise Commodities, LLC ("Hunter Wise Commodities"), Harvard Assets solicited and funneled the customer funds and orders to Hunter Wise Commodities through London Assets.  London Assets' status as a Delaware corporation was forfeited on or about

January 26, 2014.  London Assets has never been registered with the Commission in any capacity.

18.     Defendant Todd Owen Marshall is an individual whose last known address is in Deerfield Beach, Florida.  During the First Relevant Period, Marshall was President and a principal of Harvard International.  During the Second Relevant Period, Marshall was a principal of Harvard Assets, and was Director of the Board, Vice President, and Treasurer of London Assets.  For most of the period from January 1998 through May 2008, Marshall was registered with the Commission as an associated person or principal of one or more Commission registrant firms.  Marshall is not currently registered with the Commission in any capacity.

19.     On or about June 30, 1999, the National Futures Association ("NFA") Business Conduct Committee issued a complaint alleging that Marshall and others made deceptive and misleading sales solicitations.  On or about July 5, 2000, an NFA Hearing Panel issued a decision ordering Marshall to pay a $5,000 fine, tape record his conversations with customers for six months, maintain a log of his solicitations, retain the tapes for two years, and promptly produce the same to the NFA or the CFTC upon request.

20.     On or about June 28, 2007, the NFA Business Conduct Committee issued a complaint against Marshall and others, alleging misconduct by Marshall in connection with another firm he owned and controlled, Sterling International Commodities ("Sterling").  On or about July 9, 2008, an NFA Hearing Panel issued a decision finding that Marshall:

> made misleading sales solicitations that exaggerated the profit potential of trading options; . . . minimized the risk of loss of trading options and

spreads; misrepresented the performance of Sterling's . . . customers; misrepresented that Sterling's commissions were normal and customary when, in fact, they were excessive . . . and failed to disclose that the vast majority of Sterling's . . . customers lost money in the years immediately prior to the solicitations.

21.     The panel further found that Marshall used "high-pressure sales tactics, failing to uphold high standards of commercial honor and just and equitable principles of trade, and fail[ed] to supervise Sterling's sales force."

22.     The panel barred Marshall from NFA membership or associated membership and from acting as a principal of an NFA member for three years.  Among other things, the panel ordered Marshall to pay a $50,000 fine if, after the expiration of the three-year membership bar, he were granted NFA membership or associated membership or became a principal of an NFA Member.  The panel also ordered Marshall to tape record, for a period of one year, all conversations between him and existing and potential customers and retain the tapes for a period of one year from the time they were created if he again became an NFA member or associate.  Finally, the panel ordered that in the event Marshall became a principal of an NFA Member, Marshall would be required to cause all associated persons of that firm, and of any firm of which he became a principal, to tape record, for one year, all conversations that occurred between the associated persons and existing or potential customers and to retain these tapes for a period of one year from their creation.

## IV.     OTHER RELEVANT ENTITIES

23.     Harvard Assets and London Assets conducted their customers' financed precious metals transactions through Hunter Wise Commodities.

24.     Harvard International conducted its customers' financed precious metals transactions through Worth Group Inc.

25.     Hunter Wise Commodities was formed as a California limited liability company in July 2007, registered as a Nevada limited liability company in October 2010, and maintained business addresses in Las Vegas, Nevada, and Irvine, California.  Hunter Wise Commodities had several wholly-owned subsidiaries and related entities including Hunter Wise Credit, LLC (a Nevada registered LLC), Hunter Wise Trading, LLC (a Nevada registered LLC), and Hunter Wise Services, LLC (a California registered LLC) (collectively, together with Hunter Wise Commodities, "Hunter Wise").  Hunter Wise held itself out as a physical commodity trading company, wholesaler, back office support service provider, and finance company offering off-exchange financed trading in physical metals.

26.     On December 5, 2012, the Commission filed a civil action in the Southern District of Florida, captioned *CFTC v. Hunter Wise Commodities, LLC, et al.*, Case No. 12-81311-CIV, against Hunter Wise and others, alleging, among other things, that Hunter Wise engaged in illegal off-exchange precious metals transactions from July 16, 2011 continuing until the date of the complaint.  On February 25, 2013, the Court entered a preliminary injunction that, among other things, prohibited Hunter Wise from offering investments in physical metals to the retail public, froze its assets, and appointed a corporate monitor (Docket No. 78, Case No. 12-81311-CIV, *aff'd by CFTC v. Hunter Wise Commodities, LLC, et al.*, No. 13-10993 (11th Cir. Apr. 15, 2014)).  On February 19, 2014, the Court granted the Commission's motion for partial summary judgment, finding that the remaining defendants, including Hunter Wise, violated Section 4(a) of the Act, 7

U.S.C. § 6(a), by engaging in or offering illegal off-exchange retail commodity transactions (Docket No. 281, Case No. 12-81311-CIV).  On May 16, 2014, following a trial on remaining counts, the Court found that Hunter Wise "neither purchased precious metals on the retail customers' behalf . . . nor delivered metals to the retail customers," and entered a permanent injunction and imposed restitution and civil monetary penalties against Hunter Wise.  (Docket No. 303, Case No. 12-81311-CIV, at pp. 14-15, 54-58.)

27.    Worth Group Inc. ("Worth") is a Florida corporation formed in June 2002 that has previously gone by the names of Wilshire Capital Management Corp. and Worth Bullion Group Inc.  Worth describes itself as "a Florida-based precious metals wholesaler [that] might also be described as a dealer or broker of precious metals."  Worth's office is located at 3900 Military Trail, Ste. 500, Jupiter, Florida 33458.  Worth has never been registered with the Commission in any capacity.

28.    On August 13, 2013, Plaintiff CFTC brought an action in this District against Worth and its principals, captioned *CFTC v. Worth Group, Inc., et al*., Case No. 13-cv-80796-KLR, alleging, among other things, that Worth defrauded retail precious metals customers and engaged in illegal, off-exchange leveraged commodity transactions with retail customers.  On January 23, 2014, the Court entered a Consent Order of Preliminary Injunction and Other Ancillary Relief (Docket No. 61, Case No. 13-cv-80796-KLR) that, among other relief, appointed a corporate monitor for Worth, and enjoined Worth from violating certain provisions of the Act.  On July 29, 2015, the Court denied the CFTC and Worth's cross-motions for summary judgment.  (Docket No. 181, Case No. 13-cv-80796-KLR).

## V.    STATUTORY BACKGROUND

29.    Section 2(c)(2)(D) of the Act, as amended by the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, 7 U.S.C. § 2(c)(2)(D) (2012), gives the Commission jurisdiction over "any agreement, contract, or transaction in any commodity" that is entered into with, or offered to, a person that is not an eligible contract participant ("ECP") or eligible commercial entity ("ECE") "on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis" (referred to herein as a "retail commodity transaction") with respect to conduct occurring on or after July 16, 2011, subject to certain exceptions not applicable here.  In relevant part, Section 2(c)(2)(D) of the Act makes Section 4(a) of the Act, 7 U.S.C. § 6(a), applicable to retail commodity transactions "as if" such transactions were "contract[s] of sale of a commodity for future delivery."

30.    Section 1a(18)(xi) of the Act, 7 U.S.C. § 1a(18)(xi), defines an ECP, in relevant part, as an individual who has amounts invested on a discretionary basis, the aggregate of which exceeds $10 million, or $5 million if the individual enters into the transaction to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual.  Section 1a(17) of the Act, 7 U.S.C. § 1a(17), defines an ECE as an ECP that meets certain additional requirements.

31.    Section 4(a) of the Act, 7 U.S.C. § 6(a), in relevant part, makes it unlawful for any person to offer to enter into, enter into, execute, confirm the execution of, or conduct any office or business anywhere in the United States for the purpose of soliciting, accepting any order for, or otherwise dealing in any transaction in, or in

connection with, a contract for the purchase or sale of a commodity for future delivery unless the transaction is conducted on or subject to the rules of a board of trade that has been designated or registered by the Commission as a contract market or derivatives transaction execution facility for such commodity.

32.      Section 4d(a)(l) of the Act, 7 U.S.C. § 6d(a)(l), makes it unlawful for any person to be an FCM unless such person is registered with the Commission.  The Act defines FCM to include an entity that is engaged in soliciting or accepting orders for, among other things, the purchase or sale of a commodity for future delivery, any commodity option authorized under Section 4c, or any retail commodity transaction.  The Act further defines FCM to include any entity that acts as counterparty in any retail commodity transaction.  7 U.S.C. §§ la(28)(A)(i)(l)(aa)(DD) and (bb).

## VI.    FACTS

33.      During the Relevant Periods, Defendants offered to enter into, entered into, executed, confirmed the execution of, or conducted an office or business in the United States for the purpose of soliciting, or accepting orders for, or otherwise dealing in any transactions in, or in connection with, the purchase or sale of precious metals to or from retail customers on a leveraged, margined, or financed basis.  Only the leveraged, margined, or financed precious metals transactions (hereinafter "financed precious metals transactions") that Defendants conducted through Hunter Wise and Worth are at issue in this action.

### A.    Harvard International

34.      During the First Relevant Period, Harvard International had a place of business in Boca Raton, Florida.

35.     Harvard International and its officers, employees, or agents, including Marshall, solicited customers by telephone or through Harvard International's website, www.harvardassets.com, to engage in financed precious metals transactions.

36.     In these financed precious metals transactions, Harvard International's customers invested only a percentage of the total metal value and would purportedly receive a loan from Harvard International for the remainder of the metal's value. According to Harvard International's standard Account Agreement ("Harvard International Agreement"), Harvard International's customers incurred a finance charge on their loans (up to 7 percent above the prime rate), as well as service/storage charges on these transactions.  Harvard International's customers also paid a commission, typically 15 percent, on the total metal value per transaction.

37.     The Harvard International Agreement provides, in part:

> The formation of this Agreement constitutes the making of a contract in Palm Beach County, Florida, notwithstanding the manner, timing or location of the delivery or receipt of the acceptance of this Agreement by either party hereto. The making of this contract will cause the following events, among others, to occur in Palm Beach County, Florida: the negotiation of this contract will have taken place and have been completed in Palm Beach County, Florida; the contract will be executed in Palm Beach County, Florida; Harvard is located in Palm Beach County, Florida; all deposits and payments made by Customer will be delivered to and paid in Palm Beach County, Florida; all loans made by Harvard will be made from and paid in Palm Beach County, Florida; and all statements of account will be generated in an transmitted from Palm Beach County, Florida.

38.     During the First Relevant Period, some of Harvard International's customers were not ECPs or ECEs.

39.     During the First Relevant Period, Harvard International and its officers, employees, or agents solicited at least 42 retail customers to engage in at least 241 financed precious metals transactions, reflecting a total value of over $3.6 million worth

of metals.  Harvard International solicited and accepted over $1.5 million from those customers with respect to these transactions.  After Harvard International solicited retail customers and accepted customer orders and funds for these transactions, Harvard International extracted commissions and fees from these funds, and then forwarded the orders and funds to Worth.  Worth failed to make actual delivery of metals to Harvard International customers in connection with at least 241 financed precious metals transactions.

40.     During the First Relevant Period, Worth maintained a "master" account and customer sub-accounts at depositories with whom Worth contracted to hold metal. Worth purported to deliver metal to retail customers by "allocating" metal from a master account to customer sub-accounts.  However, these purported "allocations" did not result in the transfer of possession or control of metal to Harvard International's customers or agents of the customers.  Accordingly, there was no actual delivery of metals to Harvard International's customers in connection with at least 241 financed precious metals transactions.

41.     Harvard International's commissions from these at least 241 financed precious metals transactions introduced to Worth that did not result in actual delivery of precious metals to Harvard International's customers totaled at least approximately $540,000.

42.     Furthermore, at least 29 of these financed precious metals transactions did not result in "allocations" within 28 days after the transaction, and thus did not result in timely actual delivery of metals to Harvard International's customers for this additional reason.

43.     During the First Relevant Period, none of the financed precious metals transactions entered into with, or offered to, Harvard International's customers by Harvard International or its officers, employees, or agents were conducted on or subject to the rules of any board of trade, exchange, contract market, or derivatives transaction execution facility.

44.     During the First Relevant Period, Marshall was the President of Harvard International and the sole signatory for Harvard International's bank accounts.

45.     During the First Relevant Time Period, Marshall signed all checks in connection with Harvard International's retail commodity transactions business with Worth.

46.     Marshall executed Harvard International's retail account agreement with Worth.

47.     During the First Relevant Period, Marshall solicited customers for Harvard International, and solicited or accepted orders from Harvard International customers in connection with leveraged, margined, or financed precious metals transactions.

48.     During the First Relevant Period, Marshall was the "registration contact," "technical contact," "administrative contact," and "billing contact" on file with Domains by Proxy for Harvard International's website, www.harvardassets.com.

**B.      Harvard Assets and London Assets**

49.     During the Second Relevant Period, Harvard Assets and London Assets had places of business in Boca Raton, Florida.

50.     Harvard Assets and its officers, employees, or agents, including Marshall, solicited customers by telephone, by email, by mail, and/or through a website, www.harvardassets.com, to engage in financed precious metals transactions.

51.     In these financed precious metals transactions, Harvard Assets' customers invested only a percentage of the total metal value, and received loans from Harvard Assets for the remainder of the metal's value.  According to Harvard Assets' standard Customer Account Documentation and Agreement ("Harvard Assets Agreement"), Harvard Assets' customers incurred a finance charge on their loans (up to 7 percent above the prime rate), as well as service/storage charges on these transactions, and a $100 account opening fee.  Harvard Assets' customers also paid a commission, typically 12 percent, on the total metal value per transaction.

52.     The Harvard Assets Agreement provides, in part:

The formation of this Agreement constitutes the making of a contract in Palm Beach County, Florida, notwithstanding the manner, timing or location of the delivery or receipt of the acceptance of this Agreement by either party hereto. The making of this contract will cause the following events, among others, to occur in Palm Beach County, Florida: the negotiation of this contract will have taken place and have been completed in Palm Beach County, Florida; the contract will be executed in Palm Beach County, Florida; Harvard is located in Palm Beach County, Florida; all deposits and payments made by Customer will be delivered to and paid in Palm Beach County, Florida; all loans made by Harvard will be made from and paid in Palm Beach County, Florida; and all statements of account will be generated in an transmitted from Palm Beach County, Florida.

53.     After persuading a customer to invest, Harvard Assets, Marshall, and/or their officers, employees, and/or agents would collect funds from the customer for the transaction and deposit the funds into a bank account in the name of Harvard Assets.

54.     In order to effectuate financed precious metals transactions on behalf of Harvard Assets' customers, Harvard Assets and its officers, employees, or agents used London Assets to place buy or sell orders with Hunter Wise.

55.     Marshall signed checks transferring customer funds from Harvard Assets' bank accounts to London Assets' bank accounts.  At London Assets, Marshall signed checks for deposit of customer funds with Hunter Wise.

56.     During the Second Relevant Period, at least 14 Harvard Assets retail customers paid at least $231,963 to Harvard Assets and London Assets in connection with at least 48 financed precious metals transactions, reflecting a total value of over $693,000 worth of metals.

57.     These retail customers lost at least $146,003.45 of their funds to trading losses, commissions, fees, and other charges imposed by Harvard Assets, London Assets, and Hunter Wise.

58.     Harvard Assets and London Assets received commissions totaling at least $78,665.69 in connection with financed precious metals transactions from these retail customers.

59.     During the Second Relevant Period, all or most of Harvard Assets' customers were not ECPs or ECEs.

60.     During the Second Relevant Period, neither Harvard Assets nor London Assets nor Marshall nor Hunter Wise ever delivered metals to Harvard Assets' retail customers in connection with financed precious metals transactions.

61.     During the Second Relevant Period, none of the financed precious metals transactions entered into with, or offered to, Harvard Assets' or London Assets'

customers by Harvard Assets, London Assets, or their officers, employees, or agents were conducted on or subject to the rules of any board of trade, exchange, contract market, or derivatives transaction execution facility.

62.     Marshall executed the certificate of formation of Harvard Assets.

63.     Marshall was the sole signatory for Harvard Assets' and London Assets' bank accounts.

64.     Marshall signed all Harvard Assets and London Assets checks in connection with Harvard Assets' and London Assets' retail commodity transactions business with Hunter Wise.

65.     Marshall was the "registration contact," "technical contact," "administrative contact," and "billing contact" on file with Domains by Proxy for the website used by Harvard Assets, www.harvardassets.com.

### VII.    VIOLATIONS OF THE COMMODITY EXCHANGE ACT

### COUNT ONE
**Harvard International and Marshall**
**(Violations of Section 4(a) of the Act: Illegal Off-exchange Trading)**

66.     Paragraphs 1 through 65 of this Complaint are re-alleged and incorporated herein by reference.

67.     During the First Relevant Period, the retail commodity transactions described in this Complaint were offered by Harvard International and its officers, employees, or agents, including Marshall, and were entered into (a) on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis, (b) with persons who were not ECPs or ECEs as defined by the Act, and (c) were not made or conducted on, or subject to, the

rules of any board of trade, exchange, contract market, or derivatives transaction execution facility.

68.     The precious metals involved in the retail commodity transactions described in this Complaint, including gold, silver, platinum, and palladium, are commodities as defined by Section 1a(9) of the Act, 7 U.S.C. § 1a(9) (2012).

69.     During the First Relevant Period, Harvard International and Marshall violated Section 4(a) of the Act, 7 U.S.C. § 6(a) (2012), by offering to enter into, entering into, executing, confirming the execution of, or conducting an office or business in the United States for the purpose of soliciting or accepting orders for, or otherwise dealing in any transactions in, or in connection with, retail commodity transactions which were not conducted on or subject to the rules of a board of trade designated or registered by the Commission as a contract market or derivatives transaction execution facility for such commodity.

70.     Each offer to enter into, entrance into, execution, confirmation, solicitation, or acceptance of an order in any transaction in, or in connection with an off-exchange retail commodity transaction, or instance of conducting an office or business in the United States for the purpose of soliciting or accepting orders for, or otherwise dealing in any transactions in, or in connection with, retail commodity transactions made during the First Relevant Period is alleged as a separate and distinct violation of Section 4(a) of the Act.

71.     In addition to his own violations of Section 4(a) of the Act, Marshall directly or indirectly controlled Harvard International and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting Harvard International's

violations of Section 4(a) of the Act alleged in this Complaint.  Therefore, pursuant to

Section 13(b) of the Act, 7 U.S.C. § 13(b) (2012), Marshall is liable for each of Harvard

International's violations of Section 4(a) of the Act.

72.     The acts, failures, and omissions of Harvard International's officers,

employees, and/or agents, including Marshall, as described in this Complaint, were done

within the scope of the individuals' employment or office with Harvard International, and

are deemed to be the acts, failures, and omissions of Harvard International by operation

of Section 2(a)(1)(B) of the Act, 7 U.S.C § 2(a)(1)(B) (2012), and Regulation 1.2, 17

C.F.R. § 1.2 (2014).  Harvard International is therefore liable as principal for each of the

acts, omissions, or failures by its employees and/or agents, including Marshall, that

constitute violations of Section 4(a) of the Act.

## COUNT TWO
### Harvard Assets, London Assets, and Marshall
### (Violations of Section 4(a) of the Act: Illegal Off-exchange Trading)

73.     Paragraphs 1 through 72 of this Complaint are re-alleged and incorporated

herein by reference.

74.     During the Second Relevant Period, the retail commodity transactions

described in this Complaint were offered by Harvard Assets, London Assets, Marshall,

and/or their officers, employees, and/or agents and were entered into (a) on a leveraged or

margined basis, or financed by the offeror, the counterparty, or a person acting in concert

with the offeror or counterparty on a similar basis, (b) with persons who were not ECEs

or ECPs as defined by the Act, and (c) were not made or conducted on, or subject to, the

rules of any board of trade, exchange, contract market, or derivatives transaction

execution facility.

75.     The precious metals involved in the retail commodity transactions described in this Complaint, including gold, silver, platinum, and palladium, are commodities as defined by Section 1a(9) of the Act, 7 U.S.C. § 1a(9) (2012).

76.     During the Second Relevant Period, Harvard Assets, London Assets, and Marshall violated Section 4(a) of the Act, 7 U.S.C. § 6(a) (2012), by offering to enter into, entering into, executing, confirming the execution of, or conducting an office or business in the United States for the purpose of soliciting or accepting orders for, or otherwise dealing in any transactions in, or in connection with, retail commodity transactions which were not conducted on or subject to the rules of a board of trade designated or registered by the Commission as a contract market or derivatives transaction execution facility for such commodity.

77.     Each offer to enter into, entrance into, execution, confirmation, solicitation, acceptance of an order in any transaction in, or in connection with, an off-exchange retail commodity transaction, or instance of conducting an office or business in the United States for the purpose of soliciting or accepting orders for, or otherwise dealing in any transactions in, or in connection with, retail commodity transactions made during the Second Relevant Period is alleged as a separate and distinct violation of Section 4(a) of the Act.

78.     In addition to his own violations of Section 4(a) of the Act, Marshall directly or indirectly controlled Harvard Assets and London Assets and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting Harvard Assets' and London Assets' violations of Section 4(a) of the Act alleged in this Complaint.  Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13(b) (2012),

Marshall is liable for each of Harvard Assets' and London Assets' violations of Section 4(a) of the Act.

79.     The acts, failures, and omissions of Harvard Assets' and London Assets' officers, employees, and/or agents, including Marshall, as described in this Complaint, were done within the scope of the individuals' employment or office with Harvard Assets and/or London Assets, and are deemed to be the acts, failures, and omissions of Harvard Assets and/or London Assets by operation of  Section 2(a)(1)(B) of the Act, 7 U.S.C § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2014).  Harvard Assets and London Assets are therefore liable as principals for each of the acts, omissions, or failures by their employees and/or agents, including Marshall, that constitute violations of Section 4(a) of the Act.

## COUNT THREE
### Harvard International and Marshall (Violations of Section 4d of the Act: Dealing by Unregistered Futures Commission Merchant)

80.     Paragraphs 1 through 79 of this Complaint are re-alleged and incorporated herein by reference.

81.     During the First Relevant Period, Harvard International violated Section 4d(a)(1) of the Act, 7 U.S.C. § 6d(a)(1) (2012), by soliciting or accepting orders for the retail commodity transactions described above, and in connection with such orders accepting money, securities, or property (or extended credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that resulted or may have resulted therefrom, when it was not registered with the Commission as an FCM.

82.     The acts, failures, and omissions of Harvard International's officers, employees, and/or agents, including Marshall, as described in this Complaint, were done

within the scope of the individuals' employment or office with Harvard International, and are deemed to be the acts, failures, and omissions of Harvard International by operation of Section 2(a)(1)(B) of the Act, 7 U.S.C § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2014).  Harvard International is therefore liable as principal for each of the acts, omissions, or failures by its employees and/or agents, including Marshall, that constitute violations of Section 4d(a)(1) of the Act.

83.     Each solicitation or acceptance of an order for the retail commodity transactions described above, and each acceptance of money, securities, or property (or extension of credit) to margin, guarantee, or secure such trades, during the First Relevant Period, is alleged as a separate and distinct violation of Section 4d(a)(1) of the Act.

84.     Marshall directly or indirectly controlled Harvard International and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting Harvard International's violations of Section 4d(a)(1) of the Act alleged in this Complaint.  Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13(b) (2012), Marshall is liable for each of Harvard International's violations of Section 4d(a)(1) of the Act.

**COUNT FOUR**
**Harvard Assets, London Assets, and Marshall (Violations of Section 4d of the Act: Dealing by Unregistered Futures Commission Merchant)**

85.     Paragraphs 1 through 84 of this Complaint are re-alleged and incorporated herein by reference.

86.     During the Second Relevant Period, Harvard Assets and London Assets violated Section 4d(a)(1) of the Act, 7 U.S.C. § 6d(a)(1) (2012), by soliciting or accepting orders for the retail commodity transactions described above, and in connection with such orders, accepting money, securities, or property (or extended credit in lieu

thereof) to margin, guarantee, or secure any trades or contracts that resulted or may have resulted therefrom, when they were not registered with the Commission as an FCM.

87.     The acts, failures, and omissions of Harvard Assets' and London Assets' officers, employees, and/or agents, including Marshall, as described in this Complaint, were done within the scope of the individuals' employment or office with Harvard Assets and/or London Assets, and are deemed to be the acts, failures, and omissions of Harvard Assets and/or London Assets by operation of  Section 2(a)(1)(B) of the Act, 7 U.S.C § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2014).  Harvard Assets and London Assets are therefore liable as principals for each of the acts, omissions, or failures by their employees and/or agents, including Marshall, that constitute violations of Section 4d(a)(1) of the Act.

88.     Each solicitation or acceptance of an order for the retail commodity transactions described above, and each acceptance of money, securities, or property (or extension of credit) to margin, guarantee, or secure such trades, during the Second Relevant Period, is alleged as a separate and distinct violation of Section 4d(a)(1) of the Act.

89.     Marshall directly or indirectly controlled Harvard Assets and London Assets and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting Harvard Assets' and London Assets' violations of Section 4d(a)(1) of the Act alleged in this Complaint.  Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13(b) (2012), Marshall is liable for each of Harvard Assets' and London Assets' violations of Section 4d(a)(1) of the Act.

## VIII.   <u>RELIEF REQUESTED</u>

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers, enter:

A.   An order finding that, during the First Relevant Period, Harvard International, and Marshall are liable for violations of Sections 4(a) and 4d(a)(1) of the Act, 7 U.S.C. §§ 6(a) and 6d(a)(1) (2012);

B.   An order finding that, during the Second Relevant Period, Harvard Assets, London Assets, and Marshall are liable for violations of Sections 4(a) and 4d(a)(1) of the Act, 7 U.S.C. §§ 6(a) and 6d(a)(1) (2012);

C.   An order of permanent injunction prohibiting Defendants, and any other person or entity associated with them, from engaging in conduct in violation of Sections 4(a) and 4d(a)(1) of the Act, 7 U.S.C. §§ 6(a) and 6d(a)(1) (2012);

D.   An order of permanent injunction prohibiting Defendants and any of their successors from directly or indirectly:

1)   Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40)) (2012);

2)   Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3(yy), 17 C.F.R. § 1.3(yy) (2014)), for their own personal accounts or for any accounts in which they have a direct or indirect interest;

3)     Having any commodity interests traded on their behalf;

4)     Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

5)     Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

6)     Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Commission Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2014); and/or

7)     Acting as a principal (as that term is defined in Commission Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2014)), agent, or any other officer or employee of any person (as that term is defined in Section 1a(38) of the Act, 7 U.S.C. § 1a(38) (2012)), registered, exempted from registration, or required to be registered with the Commission, except as provided for in Commission Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2014);

E.     An order requiring Defendants, as well as any of their successors, to disgorge, pursuant to such procedure as the Court may order, all benefits received, including but not limited to salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or

practices that constitute violations of the Act or Commission Regulations as described herein, including pre- and post-judgment interest thereon;

F.  An order requiring Defendants, as well as any of their successors, to make full restitution, pursuant to such procedure as the Court may order, to each and every person or entity whose funds were received or utilized by them in violation of the provisions of the Act or Commission Regulations, as described herein, including pre- and post-judgment interest thereon;

G.  An order directing Defendants and any of their successors to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between them and any of the customers whose funds were received by them as a result of the acts and practices which constituted violations of the Act or Commission Regulations as described herein;

H.  An order requiring Defendants, jointly and severally, to pay civil monetary penalties under the Act, to be assessed by the Court, in amounts of not more than the greater of (1) triple Defendants' monetary gain or (2) $140,000 for each violation of the Act or Commission Regulations as described herein;

I.  An order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2012); and

J.  An order providing such other and further relief as the Court may deem necessary and appropriate under the circumstances.

Dated:  September 28, 2015

Respectfully submitted,

/s/ Xavier Romeu-Matta
Trial Attorney
Bar ID# A5502118
xromeu-matta@cftc.gov

David C. Newman
Trial Attorney
Bar ID# A5502049
dnewman@cftc.gov

R. Stephen Painter Jr.
Trial Attorney
Bar ID# A5501943
spainter@cftc.gov

Steven I. Ringer
Chief Trial Attorney
Bar ID# A5501333
sringer@cftc.gov

Manal M. Sultan
Deputy Director
Bar ID# A5501729
msultan@cftc.gov

Division of Enforcement
U.S. Commodity Futures Trading
Commission
140 Broadway, 19th Floor
New York, NY 10005
(646) 746-9733
(646) 746-9940 (facsimile)
Attorneys for Plaintiff